UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| MICHAEL WAYNE OVERTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 5:14-cv-00350-JEO |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Plaintiff Michael Wayne Overton brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. (Doc. 1).[1] He has also filed a motion to remand pursuant to sentence six of § 405(g). (Doc. 19). The case has been assigned to the undersigned United States Magistrate Judge pursuant to this court's general order of reference dated January 14, 2013. Upon review of the record and the relevant law, the undersigned finds that the Commissioner's decision is due to be affirmed and that Overton's motion to remand is due to be denied.

**I. PROCEDURAL HISTORY**

Overton filed applications for a period of disability, disability insurance benefits, and supplemental security income on May 17, 2010, alleging disability beginning December 31,

---

[1] References herein to "Doc(s). __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files (CM/ECF) system.

2004. (R. 119-30).[2] His applications were denied initially. (R. 62-70). Overton then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on February 22, 2012. (R. 33-53). He was represented by counsel at the hearing. (R. 33). On June 12, 2012, the ALJ issued her decision finding that Overton was disabled as of June 14, 2011 and granting his claim for supplemental security income, but finding that he was not disabled at any time through June 30, 2010, his date last insured, and denying his claim for disability insurance benefits. (R. 15-28).

Overton requested the Appeals Council to review the ALJ's decision and submitted additional evidence regarding his alleged disability. (R. 9-11, 13-14). The Appeals Council denied Overton's request for review on June 28, 2013. (R. 1-7). On that date, the ALJ's decision became the final decision of the Commissioner.

Overton then filed this action for judicial review under 42 U.S.C. § 405(g). (Doc. 1). After the issues had been briefed by the parties, Overton filed a motion to remand the action pursuant to sentence six of § 405(g) and submitted new evidence along with the motion. (Docs. 19, 19-1, 19-2, 19-3).

## II. STANDARD OF REVIEW[3]

The court's review of the Commissioner's decision is narrowly circumscribed. The function of the court is to determine whether the decision of the Commissioner is supported by

---

[2] References to "R. __" are to the page number of the administrative record, which is encompassed within Docs. 6-1 through 6-9.

[3] In general, the legal standards applied are the same whether a claimant seeks disability insurance benefits or supplemental security income. However, separate, parallel statutes and regulations exist for disability insurance benefits and supplemental security claims. Therefore, citations in this report should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in quoted court decisions.

substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

The court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### III.  STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[4] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

---

[4] The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, revised as of April 1, 2007.

last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i-v) and 416.920(a)(4)(i-v). The Commissioner must determine in sequence:

(1) Is the claimant presently unemployed;

(2) Is the claimant's impairment severe;

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1 [the "Listings"];

(4) Is the claimant unable to perform his or her former occupation;

(5) Is the claimant unable to perform any other work within the economy?

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir.1986). An affirmative answer to any of the above questions leads either to the next question or, at steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled." *Id.; see* 20 C.F.R. §§ 404.1520 and 416.920. Once a finding is made that a claimant cannot return to prior work, the burden shifts to the Commissioner to show other work the claimant can do. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted). The Commissioner must further show that such work exists in the national economy in significant numbers. *Id*.

## IV.  EVIDENCE BEFORE THE ALJ

Overton was 34 years old at the time of the ALJ's decision. (R. 119).  He completed the 12th grade but did not graduate.  (R. 39)  His work experience includes work as an installer, laborer, and roofer. (R. 155).  He was last insured for disability insurance benefits on June 30, 2010. (R. 21, 150).

The medical evidence reflects that Overton was examined by Dr. Henry Beeler on August 18, 2001. (R. 250).  Dr. Beeler observed lesions on Overton's scalp and removed a skin specimen for evaluation. (*Id.*)  The skin condition was diagnosed as dissecting cellulitis.[5] (*Id.*)

On September 27, 2002, Overton was examined by Dr. Steven Seidel. (R. 238).  Dr. Seidel noted that Overton reported "six or seven years of a progressive problem with pustular abscess-like areas of break-out on his scalp and then draining." (*Id.*)  Dr. Seidel observed that Overton had "chronic indurated process involving the vast area of his scalp" but "no other involved areas anywhere else on his body." (*Id.*)   Dr. Seidel recommended debridement and skin grafting, noting that Overton's other medical therapies had not helped his condition. (*Id.*)

On January 13, 2003, Dr. Seidel performed a radical excision of the dissecting cellulitis of Overton's scalp, followed by skin grafting.  (R. 235-36).  At follow-up office visits Dr. Seidel noted that Overton was doing well, and by May 9 his head was "completely healed." (R. 226).  That same day, Dr. Seidel excised a cyst under Overton's left axilla.  (*Id.*)  Dr. Seidel observed that the cyst did not appear to be similar to Overton's scalp problems.  (*Id.*)

In July 2010, after Overton applied for disability benefits and SSI, he was interviewed by

---

[5]Cellulitis is "a common infection of the skin and the soft tissues underneath ... which may cause swelling, redness, pain, or warmth." Cellulitis, WebMD, http://www.webmd.com/skin-problems-and-treatments/guide/cellulitis.

Dr. John Haney, a consultative psychologist. (R. 267-68). Dr. Haney noted that Overton "was unable to subtract serial sevens but was able to count forward by threes and had difficulty with other simple problems in change making and arithmetic." (R. 267). He also noted that Overton "recalled one of three objects after five minutes" but that his "[r]ecent and remote memory appeared intact." (*Id.*) Dr. Haney diagnosed Overton with a learning disability and determined that Overton's "[a]bility to function in most jobs appeared moderately impaired by his physical and vocational limitations." (R. 268).

Overton was also examined by Dr. Marlin Gill, a consultative physician. (R. 270-71). Dr. Gill assessed Overton with a "[h]istory of recurrent cellulitis of the scalp," noting that Overton had undergone "extensive surgery with excision of the posterior scalp and skin grafting" and that Overton subsequently complained of "getting too hot easily causing light headiness and weakness." (R. 271).

In August 2010, Dale Leonard, Ph.D., performed a Mental Residual Functional Capacity Assessment of Overton and completed a Psychiatric Review Technique Form. (R. 273-90). Dr. Leonard determined that Overton had a mild restriction in his activities of daily living, mild difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 283). Dr. Leonard concluded that Overton "can understand, remember, and complete simple tasks but not detailed ones ... [and] can maintain attention sufficiently to complete simple, 1- to 3-step tasks for periods of at least 2 hours, without the need for special supervision or extra rest periods." (R. 289). He further concluded that Overton "appears able to complete an 8-hour workday, given all customary work beaks" and that Overton "can tolerate non-intense interaction with members of the general public as well as casual interaction with

coworkers and supervisors." (*Id.*)

On October 18, 2010, Overton was seen at Quality of Life Health Services, Inc. (R. 297-300). He complained of phantom itching, hyperthermia/hypothermia, and depression. (R. 297). Dr. Eileen Gallagher examined Overton and found "[n]o impressive skin lesions." (R. 299). Although Overton reported mood swings and appeared anxious, he behaved appropriately and his attention span and concentration were normal. (*Id.*) Dr. Gallagher prescribed Doxepin and Hydroxyzine for his itching. (*Id.*)

Overton returned to Quality of Life in November 2010. (R. 301-04). He reported that he had not experienced any itching since starting Doxepin and that his depression was "a little better." (R. 301). He complained of a lesion on his left groin and one on his back, which were confirmed on examination. (R. 301, 303).

In March 2011, Overton was examined by Dr. Seidel, who observed a "cystic acne type process" in Overton's left axilla and left groin. (R. 294). Dr. Seidel diagnosed the condition as "probable hidradentis of the left axilla and left groin."[6] (R. 293). He excised both areas of hidradentis on March 31, 2011. (*Id.*)

On June 14, 2011, Overton went back to Quality of Life, complaining of depression and blood filled cysts in his groin and axilla. (R. 316). He reported that he was not taking anything for his depression because he could not afford the medication. (*Id.*) He further reported that he "had incision and drainage in left axilla and groin ... [and] see[m]s to be having same problem in right axilla and groin now." (*Id.*) Dr. Samia Moizuddin examined Overton and found 3-4

---

[6]Hidradentis is "inflammation of a sweat gland." Hidradentis, Meriam-Webster Medical Dictionary, http://www.merriam-webster.com/medical/hidradenitis.

folliculitis areas in his right axilla and a similar situation in his right groin. (R. 317). Dr. Moizuddin prescribed paroxetine (Paxil) for Overton's depression and Keflex for his folliculitis. (R. 318).

Overton returned to Quality of Life on June 29, 2011. (R. 319-22). He reported both depression and anxiety, but noted that his symptoms had improved since he started taking Paxil. (R. 319). He also reported that the sores in his groin area had improved but were still occurring continuously. (*Id.*) He was examined and found to have a lesion on his right groin. (R. 321).

Overton was next seen at Quality of Life on September 22, 2011. (R. 339-42). He reported that he was still having some anxiety attacks accompanied by mild depression. (R. 339). Dr. Manfred Ramos examined Overton and observed a rash on his bilateral groin. (R. 341). Dr. Ramos prescribed Klonopin and trazodone for Overton's anxiety and Bactroban for treatment of the rash. (R. 342). At a subsequent visit the following month, Overton reported that his anxiety and depression had improved with the new medication. (R. 343). He was examined by Dr. Ramos, who found that the rash on his bilateral groin was unchanged. (R. 345). Dr. Ramos prescribed Keflex in addition to continuing Overton's other prescriptions. (*Id.*)

Overton's last treatment records from Quality of Life are dated January 19, 2012. (R. 347-50). He again reported that his depression and anxiety had improved. (R. 347). He was examined by Dr. Ramos, who found an oozing lesion on his right groin with surrounding erythema. (R. 349). Dr. Ramos continued Overton's Keflex, Klonopin, and trazodone prescriptions. (R. 350).

In connection with his claims for disability insurance benefits and SSI, Overton obtained medical source opinions from Dr. Seidel, Dr. Beeler, and Dr. Ramos. By letter dated June 29,

2011, Dr. Seidel opined that "Mr. Overton's main limitation [with respect to his ability to work] would be any outside work where he would be exposed to the sun or excessive sweating." (R. 313). Dr. Seidel further opined:

> He may be afflicted from time to time with infected areas in his groin or axilla. That would be unpredictable. I do not think that would limit his ability to hold a full-time job with the above mentioned restrictions of significant physical labor requiring sweating or outside work.

(*Id.*) By letter dated February 17, 2012, Dr. Ramos confirmed that "Mr. Overton has Hidradentis suppurativa involving [the] Right inguinal area that is recurrent and persistent for at least 3 months despite continuing medical treatment as prescribed."[7] (R. 335). Finally, Dr. Beeler opined on February 20, 2012:

> Before today, my last visit with [Mr. Overton] was March 27, 2008. He has now developed a condition in his inner thighs and groin where he has multiple draining abscesses. He has been tried on several different antibiotics. This problem started December 2010. He had a surgical procedure done in April 2011. He has hidradentis suppurativa. There is no way this young man can hold a gainful position in the condition he is in between his scalp and his groin.

(R. 337).

At the hearing before the ALJ, Overton testified that he last worked for Hallmark installing greeting cards. (R. 39). His Work History Report reflects that he worked for Hallmark part-time from 2008 to 2010. (R. 181, 189-90). Overton testified that Hallmark stopped calling him for work after he "overheated" one night and had to leave work. (R. 40). He said that his body "doesn't regulate the body temperature very well" since the surgery was performed on his scalp. (*Id.*)

---

[7]Hidradentis suppurativa is "a chronic condition characterized by swollen, painful lesions, occurring in the armpit (axillae), groin, anal, and breast regions." Hidradentis Suppurativa, WebMD, http://www.webmd.com/skin-problems-and-treatments/hidradenitis-suppurativa-10953.

Overton testified that his leg sores make it difficult for him to walk more than 20 feet at a time and sit for more than 30 minutes. (R. 48-49). He said that he needs to lie down two or three times a day for 20 to 60 minutes. (R. 49-50). He does not visit other people very often because of panic attacks. (R. 44). He sometime drives his wife to the grocery store but crowds in the store bother him. (*Id.*). At home, he sometimes helps his wife with the cooking, does not wash the dishes very often, and helps with the laundry if his wife sorts it for him. (R. 45-46).

## V.  FINDINGS OF THE ALJ

After consideration of the entire record before her and application of the sequential evaluation process, the ALJ made the following findings:

The ALJ found that Overton met the insured status requirements of the Social Security Act through June 30, 2010, and that he had not engaged in substantial gainful activity since December 31, 2004, the alleged onset date of his disability. (R. 21).

The ALJ found that Overton has the following severe impairments: hidradentis suppurativa causing cellulitis of the scalp, depression, and a learning disability. (R. 21). She further found that the severity of Overton's hidradentis suppurativa met the criteria of Listing 8.06 as of June 14, 2011, but not prior to that date. (R. 22, 26).

The ALJ found that prior to June 14, 2011, Overton had the residual functioning capacity[8] ("RFC") to perform "light work ... except only unskilled work, avoiding exposure to temperature extremes, and humidity, with occasional coworker interaction and no public interaction." (R. 23). She also determined that Overton required an air-conditioned work environment. (*Id.*)

---

[8]Residual functioning capacity is the most a claimant can do despite his impairment(s). *See* 20 C.F.R. § 404.1545(a)(1).

Based on the testimony of a vocational expert, the ALJ found that there were jobs in the national economy that Overton could have performed prior to June 14, 2011, considering his age, education, work experience, and RFC. (R. 25). She thus concluded that Overton was not disabled prior to June 14, 2011, and, accordingly, was not disabled at any time through June 30, 2010, his date last insured. (R. 27-28). Based on these findings, the ALJ denied Overton's claim for disability benefits.[9]

## VI.  THE APPEALS COUNCIL DECISION

On July 25, 2012, six weeks after the ALJ issued her decision, Overton was examined by Dr. Paul Hazen. (R. 11). Dr. Hazen's impression was that Overton was suffering Hurley stage III hidradentis suppurativa with a history of folliculitis decalvans. (*Id.*)

Overton then requested the Appeals Council to review the ALJ's decision. (R. 13). On March 12, 2013, after his request for review had been pending several months, Overton submitted "additional evidence just received," consisting of Dr. Hazen's medical record from his examination of Overton on July 25, 2012, and a letter from Dr. Hazen dated March 7, 2013. (R. 9-11). In his letter, Dr. Hazen explained that "[Overton's] scalp inflammatory nodules have been subcategorized as a condition referred to as folliculitis decalvans/dissecting cellulitis of the scalp. However, the pathogenesis and clinical manifestations of both hidradentis and folliculitis decalvans appear to be identical, and they should both be considered to be part of the spectrum of hidradentis." (R. 10).

The Appeals Council denied Overton's request for review. (R. 3). In its written denial, the Appeals Council noted that the records from Dr. Hazen were dated after the date of the ALJ's

---

[9]The ALJ granted Overton's claim for supplemental security income, finding that he was disabled as of June 14, 2011. (R. 27-28). Overton does not challenge that aspect of the ALJ's decision.

decision and therefore did not affect the decision. (R. 4).

## VII.  ANALYSIS

In the present action, Overton urges the court to reverse and remand the Commissioner's decision denying his application for disability insurance benefits on three grounds: (1) the ALJ's determination that he was not disabled prior to June 14, 2011, is not based on substantial evidence;[10] (2) the ALJ's credibility finding is not based on substantial evidence; and (3) the ALJ did not ask a complete hypothetical question to the vocational expert. (Doc. 13 at 1).  The court will address each argument in turn.

**A.     The ALJ's Disability Determination**

Overton first challenges the ALJ's determination that he was not disabled prior to June 14, 2011.  He argues that his disability from hidradentis suppurativa "did not suddenly begin on June 15, 2011 (sic) when it met Listing 8.06." (Doc. 13 at 14-15).  He further argues that "[t]he ALJ's failure to request testimony from a medical expert regarding the onset date of [his] disability contradicts Social Security Ruling 83-20," which prescribes the Commissioner's policy and procedure for determining the onset date of a disability. (Doc. 13 at 16).  The Commissioner responds that Overton did not prove his hidradentis suppurativa disability satisfied Listing 8.06 prior to June 14, 2011, and that a medical expert was not needed to determine Overton's onset date. (Doc. 15 at 5-7).  The court agrees with the Commissioner.

First, to meet the criteria of Listing 8.06, a claimant's hidradentis suppurativa must manifest "extensive skin lesions involving both axillae, both inguinal areas or the perineum that

---

[10]In his brief, Overton argues that "[t]he ALJ's determination that [he] was not disabled at any time prior to June 15, 2011" is not based on substantial evidence. (Doc. 13 at 1, 10).  However, the ALJ found that Overton was not disabled prior to June 14, 2011, not prior to June 15, 2011. (R. 27).

persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R. pt. 404, subpt. P, app. 1, § 8.06. Moreover, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Here, the ALJ found:

> Before the established onset date [of June 14, 2011], the claimant's Hidradentis Suppurativa does not meet Listing 8.06 because the medical evidence of record fails to demonstrate extensive skin lesions involving both axillae, both inguinal areas, or the perineum for at least 3 months despite continuing treatment as prescribed. Indeed, prior to the established onset date, treatment notes show hidradentis suppurativa of only the scalp, left axial, and left groin. Since the record demonstrates hidradentis of only the left axial, left groin, and scalp, the undersigned finds the claimant did not meet Listing prior to June 14, 2011.

(R. 22) (exhibit citations omitted). Substantial evidence supports this finding, most notably the Quality of Life medical record from June 14, 2011, which reflects Overton's report that he had previously experienced "incision and drainage in his **left** axilla and groin" and seemed to be having "the same problem [in his] **right** axilla and groin **now**." (R. 316) (emphasis added). In other words, Overton's own statements to his treating physician establish that he did not experience lesions involving both axillae and both inguinal areas until on or around June 14, 2011.

Second, the critical date for purposes of establishing entitlement to disability insurance benefits is the date last insured. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) ("For DIB [disability insurance benefit] claims, a claimant is eligible for benefits where she demonstrates disability on or before the last date for which she were insured.") (citing 42 U.S.C. § 423(a)(1)(a)); *Caces v. Comm'r, Soc. Sec. Admin.*, 560 F. App'x 936, 939 (11th Cir. 2014) ("In order to be eligible for disability insurance benefits, a claimant must demonstrate a disability on

13

or before the last date on which he was insured."). Indeed, Overton admits in his brief that he was "required to establish his disability began before June 30, 2010," his date last insured. (Doc. 13 at 10). Thus, the salient issue is not whether substantial evidence supports the ALJ's finding that Overton was not disabled prior to June 14, 2011, but whether there is substantial evidence supporting her finding that Overton was not disabled at any time through June 30, 2010.

Substantial evidence supports the ALJ's finding that Overton was not disabled through June 30, 2010. In particular, Overton's treating surgeon, Dr. Seidel, opined in June 2011–one year after the date last insured–that the infections in Overton's groin and axilla "would not limit his ability to hold a full-time job with ... restrictions of [no] significant outside labor requiring sweating or outside work." (R. 313). Even Dr. Beeler, who opined in February 2012 that Overton could not hold a gainful position "in the condition he is in between his scalp and groin," was of the opinion that the condition in Overton's inner thighs and groin "started [in] December 2010," more than five months after the date last insured. (R. 337). Because substantial evidence supports the ALJ's finding that Overton was not disabled as of the date last insured, she properly denied his application for disability insurance benefits.

Third, Overton's contention that SSR 83-20 required the ALJ to call a medical expert to establish his date of disability is not well taken. Although SSR-83-20 does provide that "the administrative law judge ... should call on the services of a medical advisor when onset must be inferred," SSR 83-20, 1983 WL 31249, *3 (1983), the Eleventh Circuit has held that it is not necessary to call a medical expert to determine an onset date when the evidence establishes that the claimant was not disabled before the date last insured, as is the case here. In *Caces,* the Eleventh Circuit held:

14

> The file in this case before the ALJ and the Appeals Council is replete with medical evidence that supported the finding that Caces was not disabled at any time between the date of the alleged onset in June 2006 and the date last insured of December 31, 2006. There was no need for assistance from a medical advisor to determine the date of onset because the unambiguous medical evidence shows Caces was not disabled before the date of last insured.
>
> The plain language of SSR 83–20 indicates that it is applicable only after there has been a finding of disability and it is then necessary to determine when the disability began. *See CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1224–25 (11th Cir. 2001) (noting that in construing a statute, we look to the plain meaning of the actual language). In this case, the ALJ found that Caces was not disabled prior to the date last insured based on ample, unambiguous medical evidence from both before and after the date last insured. Therefore, because the ALJ did not find that Caces was disabled, and because that finding is supported by the evidence, the ALJ did not err in failing to call a medical expert to determine an onset date of such a disability. Accordingly, we affirm with respect to this issue.

*Caces*, 560 F. App'x at 939.  Here, similarly, ample, unambiguous medical evidence supports the ALJ's finding that Overton was not disabled before the date he was last insured.  Accordingly, the ALJ did not err in failing to call a medical expert to establish an onset date of Overton's disability.

**B.    The AlJ's Credibility Finding**

The ALJ found that Overton's statements concerning "the intensity, persistence and limiting effects" of his symptoms were "not credible" to the extent they were inconsistent with her RFC assessment. (R. 24).  Overton argues that the ALJ's credibility finding is not based on substantial evidence.  The court disagrees.

An ALJ may discredit a claimant's testimony of disabling symptoms if she articulates "explicit and adequate reasons" for doing so. *See Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th

Cir. 1995). Here, the ALJ clearly articulated her reasons for finding Overton's testimony less than fully credible:

> Inconsistent with the claimant's allegations of disability, a November 17, 2010, treatment note indicates the claimant reported he had not experienced any itching [of the scalp] since starting Doxepin and that his depression was a little better. Despite his complaints of depression, an October 18, 2010 physical examination showed the claimant had a normal attention span and concentration. Such evidence renders the claimant's allegations of disability less than fully credible.
>
> At the hearing, the claimant testified he takes medication for anxiety and depression. He stated his medication causes him to sleep 19 hours a day. The claimant admitted he does not see a psychiatrist or therapist. Regarding his treatment, the claimant stated he has undergone multiple procedures to drain his abscesses. The undersigned finds the claimant's medication regimen and treatment history do no support the presence of impairments, which are more limiting than found in this decision. Although the claimant has alleged sedation from the use of medications, the medical records, such as office treatment notes, do not corroborate this allegation.
>
> The claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Again, the claimant testified he can occasionally help prep ingredients for meals, do laundry, wash dishes, and shop.

(R. 24-25) (citations to exhibits omitted). All of these reasons provide a sufficient basis for discrediting Overton's testimony.

C.     **The ALJ's Hypothetical Question to the Vocational Expert**

Among other limitations, the ALJ determined that Overton had moderate limitations in concentration, persistence, or pace. (R. 22-23). She based this determination on the findings from his consultative mental examination in July 2010, which indicated that Overton could recall only 1 out of 3 objects after five minutes and could not perform serial 7s. (*Id.*) The ALJ accommodated these limitations in her RFC finding by limiting Overton to unskilled work (R. 23-24).

>At the hearing, the ALJ asked the vocational expert the following hypothetical question:
>
>Please assume an individual the same age, education, and work experience as the claimant. Avoid exposure to temperature extremes, humidity. Work indoors, preferably with air conditioning or temperature regulated. No public and only occasional coworker contact. What types of jobs, if any, are available?

(R. 51). The vocational expert responded : "Light, unskilled positions that are more typically found in indoor environments," including coder and marker. (R. 51).

Overton argues that the case should be remanded because the ALJ's hypothetical question to the vocational expert did not include any moderate limitations in concentration, persistence, and pace. (Doc. 13 at 25). The Commissioner responds that the ALJ's RFC finding and hypothetical question, coupled with the vocational expert's response, were sufficient to establish that there were jobs Overton could perform despite his limitations in concentration, persistence, and pace. (Doc. 15 at 14).

As Overton notes in his brief, the Eleventh Circuit has held that "[i]n order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). With respect to limitations in concentration, persistence, and pace, the Eleventh Circuit has noted that "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011). "Additionally, other circuits have held that hypothetical questions adequately account for a claimant's limitations in concentration, persistence, and pace when the questions otherwise implicitly account for these limitations." *Id.*

Here, the ALJ's hypothetical question to the vocational expert did not mention any limitations in concentration, persistence, or pace, and did not, at least on its face, appear to implicitly account for these limitations.  However, the vocational expert responded that the available jobs the hypothetical individual could perform were "unskilled" positions, which did, in fact, account for Overton's limitations in concentration, persistence, and pace.  As noted above, the ALJ's RFC finding limited Overton to unskilled work to account for these limitations.  The medical evidence demonstrates that Overton could perform such work; Dale Leonard, PhD., who conducted Overton's mental RFC assessment, found that Overton "can understand, remember, and complete simple, 1- to 3-step tasks for periods of at least 2 hours, without the need for special supervision or extra rest periods" and that Overton "appears able to complete an 8-hour workday, given all customary work breaks." (R. 289).  Therefore, the court concludes that the ALJ's failure to include any limitations in concentration, persistence, or pace in her hypothetical question to the vocational expert was harmless error, because those limitations were sufficiently accounted for in the vocational expert's response.

## VIII.  OVERTON'S MOTION TO REMAND

On January 15, 2015, two months after the briefing in this action had ended, Overton filed a motion to remand the case pursuant to sentence six of § 405(g). (Doc. 11).  In his motion, Overton argues that the case should be remanded to the Commissioner for consideration of new evidence consisting of (1) a report of a psychological examination of Overton performed by Alan Blotcky, Ph.D., on February 27, 2014, and (2) a letter dated January 7, 2015,  from Dr. Paul Hazen, who examined Overton on July 25, 2012.  (Docs. 19-1, 19-3).

Sentence six of § 405(g) provides that a court "may ... at any time order additional

evidence to be taken before the Commissioner ... but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). "A remand to the Commissioner is proper under sentence six when new material evidence that was not incorporated into the administrative record for good cause comes to the attention to the district court." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1263, 1267 (11th Cir. 2007). As the First Circuit has observed, "Congress plainly intended that remands for good cause should be few and far between ...." *Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987).

Here, even assuming that Dr. Blockty's psychological examination report and Dr. Hazen's letter would be considered material evidence, Overton has not shown good cause for his failure to incorporate the evidence into the administrative record.[11] Dr. Blotcky's report is based on his examination of Overton on February 27, 2014, at the request of Overton's counsel. (Doc. 19-1 at 1). Clearly, Overton could have sought Dr. Blockty's evaluation of his psychological condition at any time while his appeal was pending before the Appeals Council (or at any time before that), and he has offered no explanation or good cause for his failure to do so. Similarly, Dr. Hazen's letter was written on January 7, 2015, in response to a request from Overton's counsel dated November 24, 2014, after briefing in this case was complete. (Docs. 19-2, 19-3). In his request to Dr. Hazen, Overton's counsel summarized the medical evidence in the record before the ALJ and then solicited opinions from Dr. Hazen based on that summary and Dr. Hazen's examination of Overton back on July 25, 2012. (Doc. 19-2). Again, Overton could have

---

[11] The court notes that although Overton asserts in his motion to remand that Dr. Blotcky's report is material, he offers nothing in support of that naked assertion. (*See* Doc. 19 at 10-12).

19

requested Dr. Hazen's opinions at any time while his appeal was before the Appeals Council. Everything Overton presented to Dr. Hazen in November 2014 could have been presented to him more than two years sooner. Overton has pointed to no new medical or other evidence that warranted his belated request for follow-up opinions from Dr. Hazen.

The reason for requiring claimants to demonstrate good cause for not submitting new evidence is to "avoid the danger of 'encouraging claimants to seek after-acquired evidence, and then use such evidence as an unsanctioned "backdoor" means of appeal.'" *Milano v. Bowen,* 809 F.2d 763, 767 (11th Cir. 1987) (quoting *Szubak v. Sec'y of Health and Human Servs.*, 745 F.2d 831, 834 (3d Cir. 1984)). Here, Overton has submitted after-acquired evidence at the last hour in an effort to manufacture a backdoor remand of an unfavorable decision. The court will not sanction such effort, which is devoid of good cause.

For all of the foregoing reasons, Overton's motion to remand is due to be denied.

## IX. CONCLUSION

For the reasons set forth above, the undersigned concludes that the Commissioner's decision is due to be **AFFIRMED** and that Overton's motion to remand (doc. 19) is due to be **DENIED.**

**DONE,** this the 27th day of May, 2015.

*/s/ John E. Ott*
**JOHN E. OTT**
Chief United States Magistrate Judge